**In re James F. SOMMERS, Debtor.**

**James F. SOMMERS, Plaintiff,**

**v.**

**INTERNAL REVENUE SERVICE, Defendant.**

**Bankruptcy No. 89 B 30804.
Adversary No. 89 A 3069.**

United States Bankruptcy Court,
N.D. Illinois,
Western Division.

March 11, 1997.

472

Richard Jones, Woodstock, IL, Scott A. Bentley, McHenry, IL, for plaintiff.

Stacy Hallett, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter came before the Court for trial on October 25 and 26, 1995, on the Complaint of the Debtor, James F. Sommers, to Determine Dischargeability of Debt. To aid the Court in its discussion of the issues, counsel for both parties provided Post–Trial Briefs.[1] The Debtor is represented by At-

---

1. The trial concluded on October 26, 1995. The IRS brief was filed on December 4, 1995. Mr. Sommers' brief was filed on May 24, 1996. The Court then waited, and waited, and waited for the IRS's response. On November 8, 1996, the Court notified counsel for the parties that the case was scheduled for hearing on December 19, 1996, to show cause why it should not be dismissed for failure to prosecute or otherwise. By letter of November 13, 1996, the IRS advised the Court that the case was not ready to be closed, but the letter was ambiguous as to when and if the IRS's response would be filed. On December 16, 1996, the Court wrote to counsel for the IRS, copy to Attorney Bentley, as follows:

I was somewhat taken aback by the letter of November 13, 1996, wherein Loretta C. Argrett suggested that the issues are ripe for decision. It has been my understanding, and I thought this had been communicated to coun-

sel, that post-trial briefs were to be filed. We received your initial post-trial brief on December 4, 1995, and thereafter received the Plaintiff's post-trial brief, but we have not received your response.

I have been in touch with counsel before, and this is the first time I have been told that the matter is ripe for decision. Would the two of you straighten this out please, and advise me by phone. If we had known there were no further briefs to be filed, we would have addressed the issues a long, long time ago.

Again, the Court waited and waited. In the meantime, Attorney Bentley wrote to counsel for the IRS, and on February 14, 1997, Attorney Bentley advised the Court informally, at the weekly motion call (this case was not on the call) that the IRS had advised him that it would not be filing its final brief. The Court then took the matter under advisement.

torneys Richard T. Jones and Scott A. Bentley. The United States, by United States Attorney James B. Burns, for and on behalf of the Internal Revenue Service ("IRS") is represented by Attorney Stacy Hallett.

## BACKGROUND

On January 21, 1988, the United States Tax Court held that Mr. Sommers had income tax deficiencies for the tax years 1980 and 1981.[2] The 1980 tax deficiency is $39,-269.00 and the 1981 tax deficiency is $76,-723.00.[3] These amounts allegedly arose from royalty income and gain from the sale of stock not reported on Mr. Sommers' personal tax returns.

The path that leads to this litigation is complicated. Several transactions interrelate, adding to the complexity.[4] The Court will set forth the facts in specific categories, when appropriate, to achieve some measure of continuity.

Some would say the story began when Mr. Sommers purchased a company called VM Nutri Foods, Inc. in the mid–1970s. VM Nutri Foods is a food supplement manufacturing business. Mr. Sommers had been involved in this industry since 1947. Mr. Sommers' ran a successful business. In 1979, the gross profit exceeded $2.4 million dollars. *See* IRS Exhibit # 2K.

### Sale of VM Nutri and Related Transactions

In October of 1978, Mr. Sommers, through a James F. Sommers Family Trust, sold and assigned 2,000 shares of VM Nutri Foods to Mr. J. Robert Lemon for $80,000.[5] At this time, it appeared VM Nutri Foods had 5,000 shares of common stock. The breakdown of shares after this sale and assignment was as follows:

| | | |
|---|---|---|
| James F. Sommers Family Trust | — | 1800 |
| J. Robert Lemon | — | 2000 |
| Kevin Buggy | — | 200 |
| Non-issued stock | — | 1000 |

On September 15, 1979, VM Nutri Foods was transferred into a Wisconsin corporation, VM Nutri, Inc. ("VM Nutri"). An attorney by the name of John M. Couture prepared the documents.[6] *See* IRS Exhibit # 2I. The corporate documents indicate that the capital stock consisted of 10,000 shares of common stock with no par value. The corporate documents also indicate that the following entities were shareholders.

| | | | |
|---|---|---|---|
| 9/29/79 | Lorelei Investment Trust | — | 5054 |
| 9/29/79 | Liberty Investment Trust | — | 4506 |
| 9/29/79 | Kevin J. Buggy | — | 440 |

A State Court Complaint brought in part by Mr. Sommers reveals that the Lorelei Investment Trust ("Lorelei Trust") was organized on September 26, 1979. *See* IRS Exhibit # 2T at 3. Attorney Couture testified in the state court proceeding that the Lorelei Trust was created by a lay expert, Mr. Paul Westone. *See* IRS Exhibit # 14 at 9 (Day One). Attorney Couture reviewed the documents with a view to their validity under state law. *Id.* Mr. Sommers was the Executive Trustee of the Lorelei Trust. *See* IRS Exhibit # 2T. Both he and Mrs. Sommers were the Nominee Trustees of the Lorelei Trust. *Id.* Mr. Sommers is the sole beneficiary. *Id.* Attorney John Couture described the purpose of the Lorelei Trust as a vehicle to take ownership of Mr. Sommers' stock to gain certain tax advantages and conserve the

---

2. The decision of the U.S. Tax Court indicates that its decision is pursuant to agreement of the parties. *See* IRS Exhibit # 1. Mr. Charles Witt, an expert witness for the IRS, interpreted the tax court decision to mean that Mr. Sommers agreed that he underreported his taxable income. *See* R. at 93–94.

3. These amounts do not include penalties and interest.

4. The IRS provided the Court with a series of charts that plotted what the IRS believes was an elaborate scheme to evade the payment of taxes.

5. Mr. Sommers testified that the sale of VM Nutri began at a time when he was very sick and he suspected that unsavory individuals were becoming involved with the corporation. Oddly, Mr. Sommers was actually selling his business to the same individuals he alleged were stealing his business. *See* R. at 184–85. Furthermore, Mr. Sommers' eye accident which resulted in losing an eye occurred in September of 1980. The testimony and evidence reveal that the sales began in 1978.

6. Attorney Couture was hired as an attorney for VM Nutri.

assets that Mr. Sommers held. *See* IRS Exhibit # 14 at 9 (Day One).

Mr. Sommers transferred the ownership of his stock in VM Nutri to the Lorelei Trust.[7] Lorelei Trust owned a majority of the VM Nutri stock. It does not appear Mr. Sommers received any consideration for this transfer. Mr. Witt testified that the only benefit that might accrue from this transaction would be that the dividends would be paid from VM Nutri to Lorelei Trust. But if Mr. Sommers eventually received the funds, there would be no reduced tax liability. When this transfer occurred Mr. Sommers' right to receive income from VM Nutri was diminished. Thus, he transferred his stock without consideration and would receive less than what he owned prior to the transfer. *See* R. at 118.

On March 1, 1980, Lorelei Trust and Liberty Investment Trust entered into an agreement to sell VM Nutri stock to Dr. Paul A. White and Mr. Raleigh Jones. *See* IRS Exhibit # 2L. The agreement called for the sale of 1120 shares each to Dr. White and Mr. Jones.[8] The sale price to be paid to Lorelei Trust was $480,000.[9]

On March 2, 1980, Lorelei Trust, Liberty Investment Trust, and Kevin J. Buggy entered into an agreement to sell VM Nutri stock to Kelley Research Trust I. *See* IRS Exhibit # 2M. The agreement called for the sale of 2520 shares for $175,000.[10]

On March 31, 1980, Lorelei Management Corporation ("Lorelei Management") was incorporated. *See* IRS Exhibit # 2C. Mr. and Mrs. Sommers were the only two shareholders. Mr. Sommers was also a director and officer. At a Board of Directors' Meeting, held on April 1, 1980, the directors moved to permit Lorelei Management to enter into a twenty-year contract to act as Trust Manager for Lorelei Trust. The "Trust Manager Agency Contract" states, in part, that the "Trust Manager ... has exclusive authority for conducting and managing the routine day-to-day and accounting affairs of [Lorelei Trust]." *See* IRS Exhibit # 2C.

On August 23, 1980, Lorelei Trust and Kevin J. Buggy entered into a Stock Purchase Agreement with Kelley Investments for the sale of 2720 shares of VM Nutri stock for $188,888.88.[11] *See* IRS Exhibit # 20. Kelley Investments would receive 2520 shares from Lorelei Trust for $175,000, and 200 shares from Kevin Buggy for $13,888.88. After the completion of this transaction, Lorelei Trust no longer held any shareholder interest in VM Nutri.

Concurrent with the Stock Purchase Agreement, Mr. Sommers entered into a Stock Agreement with Kelley Investments. *See* IRS Exhibit # 2N. Mr. Sommers agreed to sell his entire remaining interest in VM Nutri, which would include all assets, books, financial statements and tax returns, for $175,000.[12]

On September 16, 1980, Mr. Sommers, acting as Trust Manager of Lorelei Manage-

---

7. Mr. Sommers testified that the trust was established so he could receive payments for the stock that he sold. *See* R. at 16. No documents were presented to establish the creation point of the Lorelei Trust, or proof of the actual transfer of Mr. Sommers' shares to Lorelei Trust.

8. Lorelei Trust sold 1120 shares to Mr. Jones and 244 to Dr. White.

9. A review of the Agreement for Sale indicates that Mr. Jones was to pay $320,000 and Dr. White was to pay $150,000. The original price to be paid to Lorelei Trust by Dr. White was $120,000, but due to an assignment of $30,000 by Liberty Investment Trust to Lorelei Trust, the total price was $150,000.

10. Lorelei Trust sold 1170 shares to Kelley Research Trust I.

11. The signature of the Stock Purchase Agreement indicates that Mr. David M. Wheaton signed as the Executive Trustee for Lorelei Trust. Mr. Wheaton is also the Executive Trustee for Kelley Investments. *See* IRS Exhibit # 20.

12. The Stock Agreement contained language which required Mr. Sommers to turn over title to the buildings and land, and stock certificates only upon the receipt of the balance needed to be paid by Dr. White, Mr. Jones, Mr. Evans and Kelley Investments. Additionally, the Stock Agreement states that Mr. Sommers agreed to sell to Kelley Investments his shares in ADI Management Corporation for the sum of $1.00. *See* infra pages 9–11 for discussion of ADI Management.

ment agreed to receive 150 Krugarands[13] in lieu of $100,000 due Lorelei Trust for the purchase of VM Nutri stock. *See* IRS Exhibit # 2S. The document states:

> I hereby guarantee that if One Hundred Thousand Dollars ($100,000.00) plus interest at Eight (8) percent per annum is paid to Lorelei Investments within six months of this date, the One Hundred Fifty (150) Krugarands will be returned to Kelley Investments.[14]

Mr. Sommers testified that he did not cash the Krugarands immediately. *See* R. at 51. The receipt of the $100,000 in Krugarands was not reported on Mr. Sommers' tax return for 1980. R. at 52–52; *see also* IRS Exhibit # 2A.

In April of 1980, the existence of two Certificates of Trust indicates that Mr. Sommers transferred his beneficial interest in Lorelei Trust to two separate Cayman Island corporations, namely Andros Island Investments, Ltd. and Young Island Investments, Ltd. Mr. Sommers testified that he was not aware that he or Lorelei Trust transferred anything to the Cayman Islands. *See* R. at 198–99.

Testimony provided by Mr. Witt indicated that Mr. Sommers expected to receive income from the sale of stock.[15] Mr. Witt pointed out that there is no indication of any consideration for the transfers.[16]

### *Royalty Income*

VM Nutri's tax return for the 1979 tax year listed a royalty expense of $686,019.00.

*See* IRS Exhibit # 2K. Mr. Witt's testimony revealed that the IRS concluded that the royalty expense was not a deductible expense and therefore it was disallowed to the corporation. *See* R. at 97–98. Based on this conclusion, the IRS also determined that Mr. Sommers received the revenue as a constructive dividend. *Id.* Having this background, a review of the transactions surrounding the royalties is necessary.

On October 1, 1978, the first royalty agreement entered into evidence was the one entered into by Mr. Sommers and Mr. J. Robert Lemon, the Licensors, and VM Nutri Foods and Geneva Bio–Chem, Inc. ("Bio–Chem"), the Licensees. *See* IRS Exhibit # 2G. The Agreement provides for the payment of royalties.

> 4. Royalties. In consideration for the exclusive license to manufacture and distribute granted Bio–Chem and VM, respectively, under the terms hereof, VM hereby agrees to pay Licensors an annual royalty which shall be twenty-six (26) percent of VM's annual gross sales of products manufactured or developed by Bio–Chem.
>
> . . .
>
> 6. Royalty Payments. Royalties shall be paid not less often than monthly and shall be due and payable on the 10th of month following the month for which royalties are due.[17]

The second royalty agreement was entered into between Advance Development Invest-

---

**13.** The Court will follow the spelling employed by counsel. The Court dictionary reads "Krugerrand".

**14.** Mr. Sommers received the Krugarands as the Trust Manager for Lorelei Trust. *See* IRS Exhibit # 2S.

**15.** Mr. Witt testified to the following:

> So you have three key factors here. The first is a sale in March of 1980 of the stock—or of some stock by Lorelei Trust. The second key factor is another sale in March of 1980 by Lorelei Trust. And the third and most important factor is the final sale of all of the VM Nutri stock by Lorelei in August of 1980. Given the fact that Event No. 1 and Event No. 2 happened in March of 1980, and we know that those sales generated a gain on the transfer of Nutri stock from Lorelei to some unrelated

parties off of this chart, the giving up of Mr. Sommers' beneficial interest in Lorelei Trust to Andros and Young Island a month later when he know he's got some revenue, some gain coming in, again, makes no economic sense. R. at 118–19.

**16.** Mr. Witt stated that the only reason to structure a transaction as such would be to evade income tax on the sale of stock. *See* R. at 123. Attorney Couture, on the other hand, testified, on a separate occasion, that the transaction was structured so the money would return to Mr. Sommers in the form of loans; relatively tax free dollars. *See* IRS Exhibit # 14 at 47 (day two).

**17.** Mr. Sommers testified that he did not know that 26% would have been considered a high royalty payment. *See* R. at 188–89. Mr. Witt considers 26% unusually high for this type of product. *See* R. at 102.

ments ("ADI") as Licensor and VM Nutri as Licensee in March of 1980. *See* IRS Exhibit # 2J. Before addressing the substance of this royalty agreement, it is necessary to provide the background of ADI.

The Declaration of Trust for ADI indicates that Mr. Sommers and Mr. J. Robert Lemon were the creators.[18] ADI was created on September 22, 1979. *See* IRS Exhibit # 2E. Mr. Sommers retains an equitable interest in ADI. He held 50 units of the trust. The trust corpus was listed in the schedules and it consists of the following:

### SCHEDULE A

### REAL PROPERTY

None

### SCHEDULE B

### PERSONAL PROPERTY

Secret formulas, secret processes, manufacturing procedures represented and reflected in the green loose leaf binder entitled "Formulas belonging to Advanced Development Investments"

Royalty Agreement between J. Robert Lemon, James F. Sommers, Geneva Bio–Chem, Inc. and VM Nutri Food, Inc. dated October 1, 1979 [19] (Attached hereto).

*See* IRS Exhibit # 2J.

Mr. Witt testified that the only change by the creation of ADI is who would collect the revenues. *See* R. at 104.

The second royalty agreement between ADI and VM Nutri stated that "This contract supersedes Agreement dated 10–1–78 conveyed to Advance Development Investments." *See* IRS Exhibit # 2J. The Agreement indicates that ADI is the owner of the licensed assets. The royalty payments were twenty-six (26) percent of the selling price. Mr. Sommers indicated that he was not involved in the preparation of these documents, nor did he read the documents before signing them. *See* R. at 188–89. Thus, the royalty stream from the first royalty agreement was transferred to ADI.

On or about December 31, 1979, Mr. Sommers entered into a Contract for Installment Sale of Certificates of Trust with Paradise Island Investments in Bridgetown Barbados. *See* IRS Exhibit # 2F. Under this contract, Mr. Sommers was to sell his 50 units in ADI for $100,000, to be paid in twenty annual installments.[20] *Id.* Mr. Sommers' signature is on the contract. At trial, Mr. Sommers testified that although he had heard of Paradise Island Investments, his reason for entering into such a contract was probably on the advice of Attorney Couture. Again, Mr. Sommers testified that he did not take part in this agreement. He merely believed that the transaction was structured so he could be paid for the sale of his stock. *See* R. at 191. Mr. Sommers testified that he never received any of the $100,000. *See* R. at 191.[21]

### Conveyance of Real Property

Another aspect of the testimony involved the conveyance of real property to various entities. Mr. Sommers testified that he did, in fact, convey real property to VM Nutri because he believed it went with the sale of stock. *See* IRS Exhibit # 2P; R. at 203–04.

---

**18.** Mr. Sommers affirmed that he stated the following in a previous court hearing in state court:

> ADI, I guess, is a corporation. Bob Lemon is its president and agent, I believe, and ADI was to take monies from VM Nutri as a royalty, and again, I guess it was on an offshore trust. These monies were to be sent to the Citicorp Bank, I guess it is, in Chicago, and then I think to the Grand Cayman, to the trustee, David Wheaton. The monies were then to go around some other banks, and then back to the trusts of the people who were buying me out, and then to the trusts as payment for the purchase of the stock.
>
> R. at 40–41.

**19.** The Royalty Agreement is dated October 1, 1978. *See* IRS Exhibit # 2G.

**20.** Mr. Witt testified that the sum was ridiculously low when considering that ADI, the entity collecting the royalties, received $686,000 in royalty payments the first year. *See* R. at 108. Six percent also is considered by Mr. Witt to be much lower than the standard interest rate during that time.

**21.** Plaintiff's Exhibit # 1 indicates that Mr. Lemon had $45,000 transferred from ADI to Seven Mile Beach Investments Ltd. and Paradise Island Investment Ltd., $22,500 each. This letter is dated October 4, 1980.

An Agreement dated May 28, 1981, was entered into between the Sommers and VM Nutri for the sale of real estate located at 1012 Host Drive. *See* IRS Exhibit # 2P. The consideration was approximately $146,-000.00. Mr. Sommers testified that he never received any of the $146,000. *See* R. at 203–04. Additionally, Mr. Sommers testified that he was never aware of a duty to charge rent. *See* R. at 204.

### *Testimony of James F. Sommers*

Throughout the trial, Mr. Sommers consistently testified that he did not participate in the preparation of these documents; that he did not review or examine the documents before affixing his signature to them;[22] that his practice of not reviewing documents extended to his income tax returns; and that he placed his trust in the advice of professionals. *See* R. at 187–90, 197; 213–14.

Mr. Sommers testified that he received "something over $100,000 for the sale of his business," aside from the Krugarands. *See* R. at 205. Mr. Sommers testified that the business was stolen from him by Mr. Lemon, Mr. Evans, Mr. Piper, Mr. White, Mr. Jones and possibly Mr. Couture. *See* R. at 238.

Two separate legal actions stem from these transactions. Mr. Sommers filed a state court civil lawsuit in Wisconsin in an attempt to receive his money that he felt he was owed. *See* R. at 212.[23] Mr. Sommers testified that the state court awarded him a $200,000 judgment. *See* R. at 234. The IRS disputes whether it is actually a judgment. *See* IRS Exhibit # 31. In conjunction with this action, a temporary restraining order was granted that prohibited the assets of VM Nutri to be moved. Despite the injunction, VM Nutri is now located in Batesville, Arkansas.

The other legal action resulted in the aforementioned tax court decision. Mr. Som-

mers testified that he took the initiative to bring what he felt was a wrongdoing to the appropriate individuals. *See* R. at 218–19.

IRS Exhibit # 20 entitled "Confidential Financial Information of James F. Sommers," dated February 21, 1981, and signed by Mr. Sommers, lists under assets a note receivable under a contract for sale of VM Nutri stock for $600,000. Mr. Sommers testified that he did not read it before signing.

During the tax years of 1982 through 1988, Mr. Sommers did not have the money to pay the 1980 or 1981 taxes. *See* R. at 221.

### ISSUES

The issues are whether Mr. Sommers made a fraudulent return and/or whether he willfully attempted to evade the payment of taxes on certain income in the 1980 and 1981 tax year.

### DISCUSSION

The Bankruptcy Code provides that certain tax debts are excepted from discharge. At issue here is Section 523(a)(1)(C) which states:

> A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—
>
> (1) for a tax or a customs duty—
>
> . . .
>
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax[.]

11 U.S.C. § 523(a)(1)(C).

The burden of proving the nondischargeability of Mr. Sommers' tax liability falls on the IRS. *In re Dube,* 169 B.R. 886, 891 n. 5 (Bankr.N.D.Ill.1994) (citations omitted);[24] *In re Berzon,* 145 B.R. 247, 250

---

22. The thrust of his testimony is that he blindly relied on the advice of his counsel, signing documents without reviewing or participating in the negotiations.

23. Although Mr. Sommers testified that he was owed money from the sale of his business, technically it is owed to Lorelei Trust, of which he is the sole beneficiary.

24. Similar to the court in *Dube,* Mr. Sommers initiated the adversary proceeding and therefore holds the burden of proof to show that his taxes are dischargeable. Thereafter the burden shifts to the IRS to "prove that the taxes are not dischargeable because of the affirmative defense that [Mr. Sommers] willfully attempted to evade or defeat [his] taxes," or that he made a fraudulent return. *Id.*

(Bankr.N.D.Ill.1992) (citing *In re Fernandez,* 112 B.R. 888 (Bankr.N.D.Ohio 1990); *In re Kirk,* 98 B.R. 51 (Bankr.M.D.Fla.1989)). The IRS must prove nondischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Under the preponderance of the evidence standard, the IRS must prove that it is more probable than not that Mr. Sommers made a fraudulent return or that he willfully attempted to evade payment of the subject tax debt.

\* \* \*

As a preliminary matter the Court must address the IRS' contention that Mr. Sommers is collaterally estopped from claiming that he did not fail to report a significant amount of income on his 1980 and 1981 federal income tax returns. Additionally, the IRS argues that the agreed decision from the tax court acts as res judicata, barring Mr. Sommers from contesting the amounts of the tax liabilities.

The issue before the Court is one of dischargeability, not one to determine tax liability. Courts have held that a finding of an income tax deficiency by a tax court does not have collateral estoppel effect as to the issue of dischargeability for fraud and tax evasion under Section 523(a)(1)(C). *See Berkery v. C.I.R.,* 192 B.R. 835, 839 (E.D.Pa.1996) (citing *Graham v. Internal Revenue Service,* 973 F.2d 1089 (3d Cir.1992)). Thus, a finding that a tax liability exists is not a finding of fraud or willful evasion for purposes of Section 523(a)(1)(C).

■ Mr. Sommers is precluded from relitigating the amount of the income tax deficiencies in bankruptcy court, but this does not impact the dischargeability issues. *See e.g. Berkery,* 192 B.R. at 839 (bankruptcy court correct to apply collateral estoppel to the existence of the income tax deficiencies).

■ The Court finds that Mr. Sommers is not collaterally estopped from claiming he did not fail to report amounts of income based on the tax court litigation for purposes of established dischargeability issues under Section 523(a)(1)(C). The Court agrees with Mr. Sommers that dischargeability is a distinct and separate issue from computation of tax liability. There should be no doubt that the issues before the Court solely go to the issue of dischargeability under Section 523(a)(1)(C).

*A. Willful Evasion of Taxes*

■ Whether a debtor willfully attempted to evade the payment of taxes is a question of fact to be determined by the totality of the circumstances. *Berzon,* 145 B.R. at 250. The Seventh Circuit has found that the willful evasion portion of Section 523(a)(1)(C) contains both a conduct requirement and a mental state requirement.[25] *Matter of Birkenstock,* 87 F.3d 947, 951 (7th Cir.1996) (conduct requirement goes to the manner in which the debtor sought to evade or defeat his tax liability and the mental state requirement goes to whether the debtor did so willfully).

■ As for the conduct requirement, the Seventh Circuit recognized the 11th Circuit's holding in *In re Haas,* 48 F.3d 1153 (11th Cir.1995), that nonpayment of taxes alone, even if the debtor is aware of the due taxes, does not constitute willful evasion under Section 523(a)(1)(C). *Id.* at 1156; *see also, Matter of Burgess,* 199 B.R. 201, (Bankr.N.D.Ala. 1996) (underreporting of income without more does not establish willful evasion or fraudulent return). Courts, however, can consider the act of nonpayment in its' review of the underlying circumstances to arrive at a finding for willful evasion. *Birkenstock,* 87 F.3d at 951 (citing *Dalton v. I.R.S.,* 77 F.3d 1297, 1301 (10th Cir.1996)).

When nonpayment is combined with other actions, attempts to evade taxes can be established. *See e.g., Matter of Bruner,* 55 F.3d 195, 200 (5th Cir.1995) (debtors' non-

---

**25.** To iterate, the willful evasion portion of Section 523(a)(1)(C) pertains to the debtor's willful attempt in any manner to evade or defeat taxes.

The "willfulness" standard has been the subject of much dispute among the courts. *See* Lynn M. Murtha, " 'Willfulness' and Attempts to Evade or Defeat Taxes under the Bankruptcy Code's Section 523(a)(1)(C) Exception to Discharge" 3 AMERICAN BANKR.INST.L.REV. 469 (1995) (discusses the willfulness standards under Section 523(a)(1)(C)).

payment combined with a pattern of failure to file returns, coupled with conduct obviously aimed at concealing income and assets clearly constituted an attempt to evade taxes); *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994), *cert. denied*, 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994) (failure to file tax returns and failure to pay taxes).

Interwoven into the Court's analysis is the underlying policy that Section 523(a)(1)(C) should be applied in such a fashion as to "best promote § 523's purpose of limiting discharge to the honest but unfortunate debtor." *Birkenstock*, 87 F.3d at 951 (citation omitted).

■■■ As for the mental state requirement, the Seventh Circuit concurs with the test set forth by the Sixth Circuit in *Toti*. Willful evasion requires a "voluntary, conscious, and intentional" attempt to avoid tax liability. *Toti*, 24 F.3d at 809 (this definition of willful equates with the definition found in civil tax cases) (citations omitted). Thus, a willful attempt to evade or defeat taxes requires that (1) the debtor knows he has a duty to pay the tax and (2) that he voluntarily and intentionally attempted to violate that duty. *Birkenstock*, 87 F.3d at 952. "This willfulness requirement prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are *knowing and deliberate.*" *Id.* [emphasis added].

\* \* \*

The IRS presents two arguments to support its position that Mr. Sommers willfully evaded the payment of taxes. The IRS contends that Mr. Sommers' transactions are nothing more than shams, *In re Haimes*, 173 B.R. 777, 781 (Bankr.S.D.Fla.1994) (corporations created solely for the purpose of disguising income and concealing assets), and the transfers themselves establish a willful attempt to evade taxation.[26] *See e.g., Lewis v. United States (In re Lewis)*, 151 B.R. 140, 146 (Bankr.W.D.Tenn.1992) (concealing assets falls within willful attempt to evade in

any manner); *Jones v. United States (In re Jones)*, 116 B.R. 810, 814 (Bankr.D.Kan.1990) (transferring title in real estate sufficient to show intent to evade taxes).

■■ Thereafter, the IRS argues that Mr. Sommers' course of conduct establishes a willful attempt to evade or defeat the taxes. Courts use the "badges of fraud" to establish the intent to evade taxes because direct evidence is rarely available. *Dube*, 169 B.R. at 891 (citations omitted). The badges of fraud include:

(1) the recurrence of the understatement of income for more than one tax year;

(2) the understatement of income;

(3) implausible or inconsistent explanations of behavior;

(4) inadequate records;

(5) transfer of inadequate consideration;

(6) transfer greatly reduced assets subject to IRS execution;

(7) transfers were made in the face of serious financial difficulties.

*Id.* at 892. (citations omitted).

\* \* \*

■■ The facts establish that income producing property from royalty agreements and the sale of stock was transferred to a series of different entities, including ones offshore. For instance, with the sale of VM Nutri stock, after Mr. Sommers sold stock to Mr. Lemon, he transferred ownership of his stock in VM Nutri to the Lorelei Trust. Mr. Sommers was the sole beneficiary of Lorelei Trust. Thereafter, a series of sales of VM Nutri stock occurred between Lorelei Trust and various individuals. Before the last sale of VM Nutri stock, Mr. Sommers transferred his beneficial interest in Lorelei Trust to two Cayman Island corporations. Thus, the gain from the sale of stock is transferred to these Cayman Island corporations. These actions appear to have been taken to conceal the assets from the IRS. Furthermore, Mr. Sommers' involvement is apparent based on his signature on the pertinent documents, which

---

**26.** The IRS believes the only possible reason to transfer the stock to these off-shore accounts, etc. was to evade the payment of taxes, the entities were nothing more than shams, and there was no other purpose for the transaction.

leads to the conclusion that his involvement was voluntary.

The IRS opines that the purpose of the transactions was to make it look like the income Mr. Sommers received should have been taxed to foreign entities. The IRS' expert witness testified that the transactions made no economic sense beyond the attempt to avoid the payment of taxes. Mr. Witt testified that:

> It would appear that all that happened here, one party wanted to get rid of something and not pay taxes on it, and the other party wanted to acquire it and not let Uncle Sam know about it, and if Mr. Sommers got everything he was entitled to, I don't know, but it seems to me both sides were playing with a deck to avoid or evade U.S. tax liability.

*See* R. at 143–44.

Thus, the transactions themselves are indicative of a willful attempt to evade the payment of taxes.[27]

\*　　\*　　\*

As for the badges of fraud, the IRS points to the circumstantial evidence surrounding Mr. Sommers' course of conduct which establishes a willful attempt to evade taxes. Mr. Sommers understated his income for 1980 and 1981. Thereafter, the IRS contends that Mr. Sommers' behavior was implausible and inconsistent. The Court agrees.

On the one hand, the paper trail reveals that Mr. Sommers transferred his entire interest in VM Nutri to Lorelei Trust, yet Mr. Sommers insists that he is owed money from the sale of stock. Mr. Sommers' statement on his personal financial statement recognizes the sale of VM Nutri stock valued at $600,000. This reveals that Mr. Sommers never intended to relieve himself of control of the corporation. However, Mr. Sommers cannot claim an interest in money he transferred away.

Again, a review of the facts indicates that a similar scenario arises when viewing the transactions regarding the royalty agreements.

The understatement of income, and the implausible and inconsistent explanations, combined with the series of transactions reveal a course of conduct used to willfully evade the payment of taxes.

Mr. Sommers would have the Court believe that he was an innocent pawn in a scheme designed to divest him of his company. He argues a lack of sophistication in matters of business.[28] He arduously emphasizes that he went to the IRS to express his concerns. Unfortunately, Mr. Sommers' arguments are unsubstantiated. He offers no direct or circumstantial evidence to refute the IRS's case. Mr. Sommers' protestations of innocence are belied by his business accomplishments.

Mr. Sommers' credibility is critical in this case. After closely observing Mr. Sommers on the stand and carefully considering the evidence, the Court finds the testimony of Mr. Sommers lacking in credibility. Mr. Sommers testified that the sale of VM Nutri began at a time when he was very sick and he suspected that unsavory people were becoming involved with the corporation. The evidence reveals, however, that Mr. Sommers health problems did not occur until after the stock and royalty transactions were signed. For instance, the majority of the documents were signed in 1979 or early to mid 1980. His eye injury did not occur until September of 1980.

Furthermore, Mr. Sommers insists that he did not read any of the documents, that he just signed them without review and relied

---

27. A similar scenario occurred with the royalty agreements. Mr. Sommers is an original party to the first royalty agreement. Thereafter, ADI is created and Mr. Sommers holds a beneficial interest in ADI. He sells his interest in ADI to a Cayman Island corporation. After his sale, a new royalty agreement that supercedes the original one is created between ADI and VM Nutri. As the IRS notes, this transfer was done at a time when the books of VM Nutri reflected over $600,000 in royalty payments, and Mr. Sommers listed

the sale of VM Nutri stock on his personal financial statement valued at $600,000.

28. In 1978, Nutri's gross profit exceeded $2.4 million. It is hard to accept the proposition that someone who could bring a company to this degree of success would be so lacking in sophistication as not to have questioned and understood the transactions involved here.

on the advice of counsel.[29] Therefore, he could not explain why he felt he was owed money from the sale of stock when he transferred any interest he held in the stock to Lorelei Trust. These statements without any corroboration are not sufficient to overcome the IRS's case.

The Court finds that the tax deficiencies of $39,269.00 for 1980 and $76,723.00 for 1981, should be excepted from discharge under Section 523(a)(1)(C) due to Mr. Sommers willful attempt to evade the payment of taxes.

*B. Fraudulent Return*

■ The plain language of Section 523(a)(1)(C) reveals that the IRS would only have to prove *either* a willful attempt to evade the payment of taxes or the making of a fraudulent return. Despite finding that the Mr. Sommers willfully attempted to evade the payment of taxes, the Court will delve into the issue of whether a fraudulent return was filed.

■ The standard for proving "fraud" under Section 523(a)(1)(C) is synonymous to the standard for proving a civil fraud penalty under the Internal Revenue Code. *Irvine, IV v. Commissioner of Internal Revenue Service (In re Irvine)*, 163 B.R. 983, 985–86 (Bankr.E.D.Pa.1994). Evil motive or sinister purpose is unnecessary. *Id.* (citing *Granado v. C.I.R.*, 792 F.2d 91, 93 (7th Cir.1986)). Courts will rely on the "badges of fraud" to determine civil fraud penalty under the Internal Revenue Code. *Irvine*, 163 B.R. at 986 (citations omitted). The badges of fraud include:

(1) large understatements of income made consistently over time;

(2) failure to keep adequate records;

(3) failure to file tax returns;

(4) implausible or inconsistent behavior by the taxpayer;

(5) concealing assets;

(6) failure to cooperate with taxing authorities.

*Id.*

■ The IRS raises essentially the same arguments as it did under "willful attempt to evade," and again the Court agrees. First, understatements of income exist over a two year period. These understatements are the by-product of a series of transactions carefully designed to evade the payment of taxes. As previously shown, Mr. Sommers' explanations are both inconsistent and implausible.

The fact that Mr. Sommers brought this to the attention of the IRS, for whatever reason, does not overcome the evidence presented by the IRS. Sufficient indicia exist to establish a fraudulent return was made.

The Court finds that the tax deficiencies of $39,269.00 for 1980 and $76,723.00 for 1981, should be excepted from discharge under Section 523(a)(1)(C) due to the making of a fraudulent return.

SEE ORDER.

*ORDER*

In accordance with the Memorandum Opinion filed herewith, it is ORDERED that the tax deficiencies of $39,269.00 in 1980 and $76,723.00 in 1981, are nondischargeable under Section 523(a)(1)(C) of the Bankruptcy Code.

---

**29.** Mr. Sommers presented no authority that suggests his reliance on the advice of counsel absolves him from his responsibilities.