**In re Christopher CLAXTON, Debtor.**

**Christopher Claxton, Plaintiff,**

v.

**United States of America, et al., Defendant.**

**Bankruptcy No. 00 B 13340.**
**Adversary No. 00 A 00893.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 9, 2006.

Joel A. Schechter, Grossman Mitzenmacher & Schechter, Chicago, IL, for Movant or Plaintiff.

Heather L. Richtarcsik, Barbara E. Seaman, Washington, D.C., for Respondent or Defendant.

Faith Dolgin, Revenue Litigation Bureau, Chicago, IL, trustee or Other Attorneys.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

JACK B. SCHMETTERER,
Bankruptcy Judge.

This Adversary Proceeding relates to the Chapter 7 bankruptcy petition of Plaintiff Christopher Claxton ("Claxton" or "Debtor"). Claxton filed a complaint on September 28, 2000 ("Complaint") seeking a declaration that his outstanding tax liabilities for the years 1985 through 1997[1] are dischargeable through his bankruptcy

filing. Claxton claims that these liabilities, including interest and penalties, are dischargeable because the liabilities are for tax years prior to the filing of Claxton's bankruptcy petition and because the returns were filed more than three years prior to the filing of his bankruptcy petition.

The Defendant United States of America ("United States" or "Government"), on behalf of the Internal Revenue Service ("IRS") asserted, as its "FIRST DEFENSE," that the disputed liabilities are not dischargeable to the extent the Debtor willfully attempted, in any manner, to evade or defeat such taxes. That defense to this Adversary Proceeding arises under 11 U.S.C. § 523(a)(1)(C).

Claxton and the United States have agreed that the sole issue to be decided in this case is whether the tax liabilities are dischargeable, not the amounts due for each tax year. (Trial Tr., 13–14, July 21, 2005).

The parties rested after evidence was taken, and final arguments of each was filed in writing. Following trial, the Court now makes and enters the following Findings of Fact and Conclusions of Law, pursuant to which judgment will enter separately in favor of the United States as to each tax year in issue.

### PROCEDURAL HISTORY

Claxton received a general bankruptcy discharge on August 21, 2000, and his bankruptcy case was closed on August 25, 2000. He moved to reopen his bankruptcy on September 27, 2000, for the purpose of

---

1. Claxton and Defendant have since stipulated that any liability for 1997 is not dischargeable. The return for 1997 was due April 15, 1998, less than three years prior to the bankruptcy case filing on May 3, 2000. (Revised Jt. Pretrial State. ¶ 1). Therefore,

the parties stipulated that the 1997 liability is not dischargeable because it is a priority claim under 11 U.S.C. § 507(a)(8)(A)(i). That provision does not by its terms bar dischargeability, but see 11 U.S.C. § 523(a)(1)(B)(ii).

filing an action to declare dischargeability of the aforementioned taxes. The motion to reopen was granted and the instant Adversary Complaint was then filed.

## FINDINGS OF FACT

Findings of Fact are based on evidence presented at trial, and stipulation of the parties filed herein as to uncontested facts:

1. Christopher Claxton filed a Chapter 7 Petition on May 3, 2000.

2. Claxton is a sophisticated businessman with a business degree from Michigan State University and a Masters of Business Administration degree from the University of Chicago. (Trial Tr., 38–39, July 21, 2005).

3. Claxton's work experience includes employment in management at Detroit Bank and Trust; auditor for Peat, Marwick, Mitchell & Co.; loan officer for National Bank of Chicago; and Vice President of Finance at Investor's Mortgage Insurance, a company selling personal mortgage insurance. (Trial Tr., 39–40, July 21, 2005). Claxton also holds a real estate brokers license. (Trial Tr., 8, July 22, 2005).

4. Claxton has been self employed since the end of 1981.

5. In May 1986, Claxton incorporated Equinox Financial, Inc. ("Equinox Financial"), a debt-consulting business, and Equinox Realty, Inc., a realty company through which he sold real estate. Through these companies, Claxton offered real estate brokerage, home equity loans, and residential refinancing. (Trial Tr., 48, July 21, 2005). Claxton later added bill consolidation services, insurance, and personal loans. *Id.* Claxton was the 100 percent owner, President, and Treasurer of Equinox Financial Inc. (Revised Jt. Pretrial State., State. of Unconstested Facts ¶ 5).

6. Starting in 1986, Claxton solicited clients for his businesses through a radio program that he sponsored. (Trial Tr., 48, July 21, 2005). The program usually aired on Tuesday and Thursday evenings from 7:00 to 8:00 P.M. and played gospel music, offered some ministry, and included Claxton's solicitation of clients for the services of Equinox Financial. (Trial Tr., 48, July 21, 2005).

7. In June 1993, Claxton incorporated Shekinah Glory Productions, Inc. ("Shekinah Glory") to produce musical productions and publications and to preach ministries to people. Claxton simultaneously incorporated Emanuel Gospel Publishing, Inc. (Trial Tr., 50, July 21, 2005).

8. Claxton established bank accounts for Equinox Financial and Shekinah Glory and used these accounts as his nominee accounts, i.e., accounts under his total control, to pay all of his personal expenditures. (Trial Tr., 50, 167, July 21, 2005).

9. In 1995 and 1996, Claxton received checks made payable to him from Erik Martin, a bankruptcy attorney to whom Equinox Financial referred clients. (Trial Tr., 73, July 21, 2005). Claxton had no restrictions on how the money was spent, so long as it went toward Shekinah Glory. (Trial Tr., 76, July 21, 2005). The checks Claxton received from Erik Martin from 1995 through 1997 totaled approximately $274,000. *Id.*

10. From approximately January 1995 through at least March 1997, Claxton and Equinox Financial referred approximately 900 clients to Erik Martin & Associates for consultation and/or the filing of Chapter 13 petitions. (Def. Ex. 46 at 3–4). The clients who consulted with Equinox Financial prior to their referral to Erik Martin were charged and paid a consultation fee of $275 to $375 to Equinox Financial. *Id.* The clients of Equinox Financial paid for

consultation services in cash, checks, and money orders. (Trial Tr., 82, July 21, 2005).

11. From 1985 through 1996 Claxton did not file any tax returns for himself or any of his companies. (Trial Tr., 52, July 21, 2005).

12. In or around 1990, Claxton sought advice from his pastor, Bishop Horace Smith, with whom he discussed his failure to file tax returns. (Trial Tr., 68, July 21, 2005).

13. In January of 1996, Claxton sought assistance from various tax attorneys and accountants to rectify his non-filing status. Ultimately, Claxton employed Terrance McWhorter, an accountant and attorney, to prepare his tax returns. (Trial Tr., 149–151, July 21, 2005).

14. Claxton gave Mr. McWhorter checkbook stubs, bank statements, and check registers to prepare his taxes. (Trial Tr., 60, July 21, 2005).

15. On February 18, 1997, Claxton filed his personal federal income tax returns, Forms 1040, with a letter from Mr. McWhorter for the years 1985 through 1995.

16. Claxton's 1996 personal federal income tax return was subsequently filed with the IRS on or before April 15, 1997.

17. On July 15, 1997 Claxton filed with the IRS U.S. Corporate Income Tax Returns Forms 1120 for Equinox Financial, Inc., for the years 1991 through 1996.

18. On July 15, 1997 Claxton filed with the IRS U.S. Corporate Income Tax Returns, Forms 1120, for Shekinah Glory Productions, Inc., for the years 1995 and 1996.

19. With respect to the interest and penalties Claxton owed for the years 1985 through 1995 and the unpaid tax for the years 1993 through 1995, Claxton requested and received an installment payment plan from the IRS.

20. After making some installment payments, Claxton stopped making further payments to the IRS.

21. Claxton knew he had a duty to file tax returns timely and pay all taxes due for each of the years in issue here. (Trial Tr., 66–67, July 21, 2005).

22. The primary reason that Claxton did not file income tax returns on time was fear of possible criminal consequences. (Trial Tr., 67, July 21, 2005).

23. In 1987, a year in which Claxton did not file timely tax returns, he purchased a home for which he paid approximately $19,000 as a down payment. (Trial Tr., 131–132, July 21, 2005). He generated the funds necessary for the down payment from his businesses. *Id.*

24. On Debtor's Statement of Financial Affairs, signed under the penalty of perjury, Debtor did not list any gifts or charitable contributions made within one year immediately preceding the commencement of his bankruptcy case. (Trial Tr., 120, July 21, 2005). On Debtor's 1999 tax return, however, he indicated on Schedule A, Itemized Deductions, that he made $15,552 in charitable contributions. (Def.Ex.8). On Debtor's 2000 tax return, he indicated on Schedule A, Itemized Deductions, that he made $10,369 in charitable contributions. (Def.Ex.9).

25. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This proceeding is referred here by the District

Court under the standing referral procedure in District Court Internal Procedure 15(a). Venue is proper in this District under 28 U.S.C. § 1409(a).

## DISCUSSION

In a Chapter 7 discharge, generally all liabilities of the debtor arising before the filing of a bankruptcy petition are discharged. 11 U.S.C. § 727(b). Congress, however, intended that the fresh start provided by the bankruptcy discharge would apply only to the "honest but unfortunate debtor." *In re Birkenstock,* 87 F.3d 947, 950 (7th Cir.1996) (citing *Grogan v. Garner,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). To assist in achieving that purpose, Congress provided certain exceptions to the discharge in 11 U.S.C. § 523.

Section 523(a)(1)(C) provides:

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or customs duty—

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax ...

When deciding whether a particular debt falls within any exception under 11 U.S.C. § 523, the statute should generally be construed strictly against the objecting creditor in favor of the debtor in order to give the debtor a better chance at a fresh start. *In re Reines,* 142 F.3d 970, 972–973 (7th Cir.1998). Therefore, the party claiming an exception to discharge usually bears the burden of proving by a preponderance of the evidence that the debt is not dischargeable. *In re Bero,* 110 F.3d 462, 465 (7th Cir.1997).

The Government does not claim that Claxton made a fraudulent return; rather it relies solely on the second portion of § 523(a)(1)(C). Therefore, the Government must prove by a preponderance of the evidence that Claxton "willfully attempted in any manner to evade or defeat" his federal income tax liabilities.

"The plain language of the second part of § 523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully')." *In re Birkenstock,* 87 F.3d at 951. These two requirements will be addressed here separately.

### The Mental State Requirement

Pursuant to the mental state requirement, willfully has been interpreted for purposes of § 523(a)(1)(C) to require that the debtor's attempts to avoid his tax liability be "voluntary, conscious, and intentional." *In re Birkenstock,* 87 F.3d at 952 (citing *Toti v. United States,* 24 F.3d 806 (6th Cir.1994)). Therefore, the debtor must both (1) know that he has a duty under the law to pay taxes, and (2) voluntarily and intentionally attempt to violate that duty. *In re Birkenstock,* 87 F.3d at 952. "This willfulness requirement prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." *Id.*

The willful conduct under § 523(a)(1)(C) is read in accordance with other civil sections, denoting intentional, knowing, and voluntary acts. *In re Dube,* 169 B.R. 886, 891 (Bankr.N.D.Ill.1994). Thus, the criminal elements of a bad purpose or evil motive need not be present.

In this case, there is ample evidence to support a finding that Claxton's attempts to avoid tax liability during the years in question were willful. Claxton testified

that he knew he had a duty to file tax returns and to pay his taxes. (Trial Tr., 66, July 21, 2005). Claxton testified that he was fully aware that if he filed his tax returns, the IRS would attempt to collect from him. (Trial Tr., 67, July 21, 2005). Claxton further illustrated his awareness of this duty by discussing his failure to file tax returns with his pastor beginning in 1990. (Trial Tr.,68, July 21, 2005).

Claxton's testimony also demonstrates that he is a sophisticated businessman. Claxton received a Bachelor's Degree from the University of Michigan in business and finance in 1982. (Trial Tr., 38, July 21, 2005). In 1977, he was awarded a Masters of Business Administration from the University of Chicago in accounting and behavioral science. (Trial Tr., 38, July 21, 2005). Claxton's professional experience includes working as an internal auditor of systems at the Comerica Bank in Detroit. (Trial Tr., 38, July 21, 2005). He later worked for First National Bank of Chicago extending commercial real estate loans and at Pete, Marwick, Mitchell & Co., a public accounting firm. (Trial Tr., 44, July 21, 2005). In addition to Claxton's banking and auditing experience, he gained experience in the mortgage finance area as an employee in the Chicago office of Investors Mortgage Insurance Corporation where he held the position of vice president of mortgage finance. (Trial Tr., 44–45, July 21, 2005). While there, he was responsible for six Midwest states: Illinois, Indiana, Wisconsin, Minnesota, South Dakota, and North Dakota. (Trial Tr., 45–46, July 21, 2005).

Claxton's awareness of the duty to file and pay his taxes, as well as his status as an educated businessman, demonstrates that his failure to file and pay his taxes was willful. Further, Claxton clearly was aware of the seriousness and potential repercussions of his actions, as he discussed his tax problems and guilt over his failure to file and pay with his pastor. Despite all of this, he waited until February 18, 1997 to submit to the IRS tax returns for the years 1985 through 1996. (Jt.Ex.32). Claxton's testimony as well as his actions clearly establishes that his attempts to evade his tax liabilities were willful.

### The Conduct Requirement

 The act of nonpayment of taxes may not by itself be sufficient to deny discharge of a tax liability. *In re Birkenstock*, 87 F.3d at 951. Mere nonpayment of taxes, without more, does not always represent dishonesty, as an honest debtor may be without sufficient resources to pay tax obligations. *Id.* However, failure to pay taxes is of course relevant evidence that should be considered in the totality of conduct to determine whether the debtor willfully attempted to evade or defeat taxes. *In re Birkenstock*, 87 F.3d at 951. Where nonpayment of taxes is coupled with a pattern of failing to file tax returns or where the debtor has taken other actions to conceal assets or income from the IRS, it may reasonably be found that the debtor sought to "evade or defeat" his tax liabilities. *Id.* at 951–952.

 Because direct proof of a debtor's attempt to evade tax obligations is usually unavailable, the "intent to evade taxes is generally provable by circumstantial evidence and reasonable inferences drawn from the existence of certain fact patterns, otherwise called badges of fraud." *In re Berzon*, 145 B.R. 247, 250 (Bankr.N.D.Ill. 1992). Badges of fraud include the following: (1) significant understatements of income made repeatedly; (2) failure to file tax returns; (3) repeatedly filing returns late; (4) implausible or inconsistent behavior by the taxpayer; and (5) failure to cooperate with federal tax authorities. *Id.*

In this case, the Debtor's conduct went beyond merely not paying taxes, including

both a failure to file tax returns and attempts to conceal income from the IRS. When Claxton was a W–2 employee, and taxes were withheld from his pay, he filed tax returns. (Trial Tr., 51, July 21, 2005). However, when Claxton became self-employed and was no longer issued W–2 forms, he stopped filing tax returns until February 18, 1997. (Trial Tr., 44–45, July 21, 2005). One of Claxton's explanations as to why he stopped filing tax returns was that he lacked the funds to pay his tax obligations. As explained in his closing argument:

> The evidence before the Court is simply a man trying to provide for his family with a roof over their head, clothes on their back and food on the table. When it came time for the Plaintiff to choose whether he could pay the tax obligations or to provide food, clothing and shelter for this family, he chose to do the latter. (Pl.'s Closing Argument at 10).

Claxton's explanation lacks merit for several reasons. First, according to the delinquent tax returns filed as reflected in Claxton's Form 1040, Individual Income Tax Returns, his annual adjusted gross income from 1993 through 1996 ranged from $60,033 to $154,092. (Jt.Ex.1–5). Based on these amounts, it is not credible to argue that Claxton had insufficient funds to file returns and pay his tax obligations while still supporting his family. Many Americans who earn far less income than Claxton manage to file returns and pay their taxes.

Second, even if Claxton did not have the means from time to time to pay his tax debts in full, he nevertheless should always have filed his income tax returns when due and made some tax payments. *Berzon v. United States*, 145 B.R. 247, 251 (Bankr. N.D.Ill.1992) (finding debtor's claim that he couldn't file tax returns because he didn't have the money irrelevant). "It would be impossible for the IRS to say the debtor was willfully trying to evade taxes if he fully and accurately revealed to the IRS on a timely basis the fact that he owed those taxes but failed to pay them." *Id.* at 252. Claxton knowingly violated his duty to file tax returns whether or not he always had funds to pay the taxes that were due.

Lastly, while Claxton argues that he simply could not pay his taxes because he had to provide food, clothing, and shelter for his family, evidence demonstrates that he went above and beyond providing his family with the basic necessities. During the years that Claxton was not paying his tax obligations, he purchased a new home by providing $19,000 for a down payment (Trial Tr., 131–132, July 21, 2005), purchased a Cadillac (Trial Tr., 68, July 22, 2005), paid for private education for his children (Trial Tr., 134–135, July 21, 2005), and went on a two-day cruise with his wife. (Trial Tr., 68, July 22, 2005). He also made charitable contributions on a consistent basis. (Trial Tr., 64, July 22, 2005). These expenses are not consistent with the alleged meek financial condition the Debtor attempts to portray; rather, these expenses demonstrate that the Debtor did indeed have funds to pay his income taxes. Moreover, Claxton presented no credible explanation as to why he did not use the $274,000 given to him by Erik Martin over several years to pay any of his tax obligations.

Claxton's response to his first set of interrogatories further indicates that paying tax obligations was originally not a "priority" to him. When asked why he failed to pay his tax liability in full for each of the years in suit, he did not state that he lacked money to pay them when due, but rather revealed that paying taxes was not high on his agenda. He stated:

In the late 1980's and early 1990's, the services of Equinox Financial were expanded to include consumer consultation in the areas of residential refinancing and home equity loans and bill consolidations. As my income started to be more consistent, the filing and payment of my income taxes became **more of a priority to me.**

(Jt. Ex. 45, at 3, Pl.'s Answer to First Set of Interrogatories) (emphasis supplied).

### Claxton's Failure to Keep Adequate Records Combined with the Nature Of His Income Warrants an Inference That He Did Not Report All Income

In the totality of circumstances considered in determining whether to deny a discharge, inadequate records and understatement of income are considered badges of fraud. *Sommers v. IRS (In re Sommers)*, 209 B.R. 471, 479 (Bankr. N.D.Ill.1997). In this case, Claxton's inadequate records clearly warrant a finding that his income was understated thus constituting a badge of fraud. With respect to payments that Claxton received from his Equinox Financial clients, he testified that they paid in cash, money orders, and checks. (Trial Tr., 82, July 21, 2005). However, the only records that Claxton kept for Equinox Financial and his other corporations were checkbook registers and bank statements. (Trial Tr., 60, July 21, 2005). Thus, only the funds that he decided to deposit into his bank account were documented. There were no general ledgers kept by the corporations, no company books (Trial Tr., 61, July 21, 2005), and there was no auditing done whatsoever of the companies. (Trial Tr., 82, July 21, 2005). Furthermore, Mr. McWhorter, Claxton's tax preparer, testified that he did not believe that he could perform an audit based on the records provided to him. (Trial Tr., 160, July 21, 2005).

Claxton described his business records as generally being in a "disarray." (Jt. Ex. 45, at 5). All of his accounts were commingled and one could not distinguish what was personal and what was business related. (Trial Tr., 167, July 21, 2005). Claxton provided Mr. McWhorter with documents lumped in a box labeled by the year. (Trial Tr., 155, July 21, 2005). From these documents, Mr. McWhorter loaded the entries into a computer program in an attempt to create an operating or income statement. (Trial Tr., 82, July 21, 2005). Consequently, it took several months to prepare the tax returns. (Trial Tr., 179, July 21, 2005). Upon completion, Mr. McWhorter testified that he could not say that at the time of preparing the returns for Claxton all of his income was included. (Trial Tr., 9, July 22, 2005).

Claxton also failed to ever file any tax returns for Equinox Realty, the corporation he used to sell real estate for which he paid himself commissions. (Trial Tr., 54, July 21, 2005). Claxton testified that he did not recall how many dollars of real estate he sold through Equinox Realty, but whatever income he made, he reported it on the tax returns of Equinox Financial. (Trial Tr., 55, July 21, 2005). Mr. McWhorter, however, testified that he never saw documents showing commissions from Equinox Realty, Eureka Realty, or from Royal Realty, the other two brokerage businesses paying commission to Claxton. (Trial Tr., 8–9, July 22, 2005; Trial Tr., 46–47, 58–59, 150–151, July 21, 2005). Mr. McWhorter was not even aware that Claxton owned a license to sell real estate. (Trial Tr., 8, July 22, 2005).

Claxton admits that it is only his word that all of the income was included in his tax returns. (Trial Tr., 61, July 21, 2005). In light of Claxton's less than adequate bookkeeping and other questionable con-

duct, his self-serving testimony is insufficient to infer or find that all of his income was reported.

### Claxton's Nominee Accounts Provide Further Evidence That His Income Was Under Reported

■ Concealing assets from the IRS by "placing assets in the name of others ... by using nominee accounts for depositing large sums of income, amounts to an affirmative act of tax evasion."

*Gardner v. U.S. (In re Gardner)*, 360 F.3d 551, 558 (6th Cir.2004) (citing *U.S. v. McGill*, 964 F.2d 222, 230 (3d Cir.1992)).

From the mid 1980s through the years in suit, Claxton testified that he had no bank accounts in his name, using only the accounts of his corporations to pay his personal expenses. (Trial Tr., 73, July 21, 2005). At the time that Claxton filed his bankruptcy petition in May 2000, he still did not have any "[c]hecking, savings or other financial accounts" in his name. (Jt. Ex. 36, Schedule B). Claxton represented on his bankruptcy schedules that he has no accounts at any financial institution when he was using corporate accounts for many years to pay his personal expenses. Claxton also did not list the bank accounts of his corporations on his bankruptcy Schedule B, even though the majority of debts he listed on bankruptcy Schedule F were not personal debts, but were debts incurred by his businesses.

### Claxton's Conduct Is Relevant to Determine Whether He Willfully Attempted to Evade or Defeat His Tax Obligations

■ In his final argument, Claxton asserts that the United States has made "wild accusations without foundation that the Debtor did not disclose all of his income on the returns that were filed" and suggests that "[a]ny of the Closing Argument detailing bald allegations and accusations that the Plaintiff failed to state all of his income is clearly irrelevant to this Court's decision." (Pl.'s Final Argument at 2–4). With respect to the evidence cited in the Final Argument by the United States showing that Claxton's bankruptcy schedules were inaccurate and misleading, Claxton stated that "[t]he fact that the Plaintiff's expenses noted on schedule J are allegedly inaccurate or that his schedules with respect to certain bank accounts held by Phoenix Financial are not properly listed is simply not relevant." (Pl.'s Final Argument at 4). Claxton further argues that because this is not an objection to the general discharge, but rather a case of whether he willfully attempted to evade or defeat his tax obligations, such evidence is irrelevant.

■ To the contrary, Claxton's conduct both before and following the filing of his tax returns is highly relevant as it identifies several badges of fraud that support the finding that he willfully attempted to evade or defeat his tax obligations. The language of 11 U.S.C. § 523(a)(1)(C) includes whether the debtor attempted to evade or defeat such tax obligations "in any manner." Thus, any of Claxton's conduct may be considered in determining whether he evaded or defeated his tax obligations. *See U.S. v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind."); *Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir.1996) (construing "in any manner" of § 523(a)(1)(C) broadly). It follows that the phrase "attempt in any manner to evade or defeat" includes all of Claxton's conduct in the evidence and testimony presented in this case. This evidence demonstrates that Claxton knowingly failed to file tax returns for over fourteen years, failed to keep accurate records of his income and his corporation's financial deal-

ings, concealed income from the IRS through nominee accounts, and failed to disclose corporate bank accounts on his bankruptcy schedules from which he paid his personal expenses.

### Claxton's Principal Legal Argument Lacks Support

In Claxton's final argument, he urges this Court to follow an Eleventh Circuit opinion, *In re Haas*, 48 F.3d 1153 (11th Cir.1995). In doing so, Claxton argues that the facts *In re Haas* are analogous to this case. In discussing 11 U.S.C. § 523(a)(1)(C), it was noted in the *Haas* opinion:

> The omission of the words 'or the payment thereof' from section 523(a)(1)(C), in light of Congress's previous inclusion of these words on four previous occasions, indicates that Congress did not intend that a failure to pay taxes, without more, should result in the nondischargeability of a debtor's tax liabilities in bankruptcy.

48 F.3d at 1157. Claxton argues that because he only failed to file taxes "without more" his tax obligations should be discharged.

First, it must be noted that the cited *Haas* opinion was later modified by *In re Griffith*, 206 F.3d 1389 (11th Cir.2000). In *Griffith*, the Eleventh Circuit reaffirmed what it referred to as its first holding in *Haas* that "mere nonpayment of taxes is insufficient to establish the exception found in § 523(a)(1)(C)." 206 F.3d at 1394. However, with respect to the second holding in *Haas*, it opined:

> While we believe that the application of the canons of construction produced a plausible interpretation of § 523(a)(1)(C) in *Haas*, we now conclude that the more reasonable interpretation of § 523(a)(1)(C) is that it renders nondischargeable tax debts where the debtor

engaged in affirmative acts seeking to evade or defeat collection of taxes.

*Id.*, 206 F.3d at 1395. Under *Griffith*, tax debts are nondischargeable where the debtor has engaged in affirmative acts constituting a willful attempt to evade or defeat payment of taxes. This ruling is consistent with precedent in the Seventh Circuit. *See In re Birkenstock, supra*, 87 F.3d at 951 (noting that while nonpayment of taxes alone may be insufficient to bar discharge of a tax liability, it is relevant evidence to be considered in the totality of conduct used to determine whether the debtor willfully attempted to evade or defeat taxes).

Moreover, the argument that Claxton merely failed to file tax returns "without more" ignores the evidence establishing that Claxton engaged in many affirmative acts seeking to evade or defeat his tax obligations as earlier discussed.

### Claxton's Interpretation of Witnesses Testimony Is Incomplete, Inaccurate, and Not Supported by the Evidence

In Claxton's argument under the subheading "Testimony of Witnesses," he focused on the following: (1) selected testimony of Claxton and Mr. McWhorter regarding funds available to Claxton to pay his tax liabilities; (2) Claxton's record keeping; (3) Claxton's pretense to engaging in common small business practices; and (4) statements pertaining to the contents of Form 433. Claxton's arguments with reference to that evidence are flawed.

He argues that he could not use the $274,000 given to him by Erik Martin or other corporate income at his discretion. Rather, Claxton asserts that the income was used to pay the corporate expenses of Shekinah Glory and Equinox Financial. (Pl.'s Final Argument at 5), such as "compensation of officers, rents, advertising,

and other deductions . . ." (Pl.'s Final Argument at 7). Claxton, however, had complete control over the corporation's expenses, including his compensation as the sole officer, extent of advertising expenses, rents he agreed to, and the like. Moreover, he does not even attempt to justify use of corporate income to pay his personal mortgage and down-payment on his house, car payments, and other personal expenses. By choosing to use personal income to pay corporate and personal expenses while failing to pay any corporate or personal tax obligations for many years, Claxton took affirmative steps to evade or defeat his taxes.

Claxton also makes reference to Mr. McWhorter's testimony. McWhorter stated that the documents submitted by Claxton were sufficient for the purposes of preparing his tax returns. (Trial Tr., 10, July 22, 2005). While documents provided to Mr. McWhorter may have been sufficient for purposes of preparing Claxton's tax returns, this does not mean that Claxton disclosed all of his income as those returns could have been prepared even if income was under reported. In fact, the evidence in the record supports the inference that not all of Claxton's income was reported. Mr. McWhorter testified that he could not say that all of Claxton's income was reported (Trial Tr., 9, July 22, 2005), he never saw evidence of any commissions from any real estate sales (Trial Tr., 8, July 22, 2005), and he would not have been able to perform an audit based on the records provided to him. (Trial Tr., 160, July 21, 2005). Indeed, Mr. McWhorter had to "back out" personal expenditures from corporate checkbook registers and stubs to be able to create an "income statement," and that statement was subject to verification only by Claxton.

Claxton further attempts to portray himself as a small businessman who should not be expected to keep sophisticated or thorough records. (Pl.'s Final Argument at 6). His argument cites Mr. McWhorter's testimony in which he stated that in his experience some small business owners provided him with casually kept records from which he could prepare "shoebox returns." (Trial Tr., 161, July 21, 2005). While Claxton would like to be treated as that kind of small businessman, based on his sophisticated education, professional experience, amounts of admitted income, and steps taken to evade and defeat payment of his taxes, he does not fit that profile. His conduct included his failure to file anything with the IRS for over fourteen years, failure to keep any personal bank accounts, and failure to keep records for his corporations so that they could be audited. Even if Claxton is viewed as a small businessman who kept only "shoebox records," he still fails to offer an explanation for his failure to file business tax returns for over a decade.

Finally, Claxton's assertion with respect to the content of a Form 433A, allegedly submitted to the IRS but not introduced into evidence, is meaningless. His argument that "Mr. McWhorter testified that Form 433A contained a full and accurate disclosure of Plaintiff's assets and liabilities" exaggerates the McWhorter testimony:

> Question: And did you at that particular time feel that there was anything that Mr. Claxton was withholding from you in preparation of that form?
>
> Answer: No.
>
> Question: And it was a full and accurate disclosure of Mr. Claxton's assets and liabilities and his income and expense statement at that particular time as far as you knew?
>
> Answer: As far as I knew.

(Trial Tr., 17, July 22, 2005). Mr. McWhorter merely testified to knowing of

no other assets or liabilities than those that were disclosed to him. Indeed, the evidence shows that there was much more Mr. McWhorter did not know about Claxton's income, including additional income Claxton had in 1996 that was not included in his original tax return, commission income from real estate sales, cash payments from Equinox Financial clients that were not deposited into the corporate checking account, and substantial payments Claxton received from Erik Martin.

***Claxton Eventually Filed His Tax Returns Due to the Possibility of Criminal Consequences***

 The United States argues that Claxton filed his tax returns under the imminent threat of being discovered due to an investigation started by the United States Trustee. (U.S. Rebuttal at 5). Claxton argues that this conclusion is irrelevant and is merely a way to paint Claxton in the worst light possible. (Pl.'s Closing Argument at 4). He argues that he filed tax returns voluntarily and not subsequent to any assessments made against the corporations by the Government. (Pl.'s Final Argument at 11). While Claxton filed his tax returns following the start of an investigation by the United States Trustee, he argues that "there is no direct evidence linking the notion of the Defendant that Plaintiff was aware of an investigation between January 24 and February 18 of 1997, a scant 25 days." (Pl.'s Final Argument at 7).

While there was no direct evidence that Claxton filed tax returns because of the investigation, an inference of the connection between the start of the United States Trustee's investigation and Claxton's submission of his tax returns is warranted based on the evidence. Claxton's failure to file his twelve tax returns until after the investigation had commenced, negates his claim of voluntariness in light of the rec-

ord. Claxton responded under oath to written interrogatories that he prepared tax returns in 1990 but did not then submit them to the IRS because he feared the criminal consequences. Between 1990 and 1997, Claxton believed that he was not on the IRS radar screen. However, in 1997 after the start of the investigation into his financial dealings with Erik Martin, Claxton must have fully understood that discovery by the Government of his non-filing status and non-payment of his tax obligations was only a matter of time. The filing of Claxton's returns on February 18, 1997 was a deliberate move to forestall likely discovery and criminal prosecution for his fourteen year avoidance, not a fully voluntary act. The fact that Claxton failed to file tax returns for fourteen years, but filed them immediately after the commencement of an investigation leads to the inference that he did so out of fear of the possible consequences for not filing.

## CONCLUSION

Knowing that the IRS could not collect from him so long as it did not receive any information, Claxton successfully kept the IRS at bay by filing no returns for over fourteen years. Despite Claxton's substantial income during that period, he failed to file tax returns, failed to pay his tax obligations, failed to keep proper company records to document his primarily cash income, and used nominee accounts to conceal his income. The record is also sufficient to find badges of fraud. Such actions taken by a sophisticated businessman undoubtedly supports a finding that Claxton willfully attempted to evade or defeat his tax obligations, and it is found and concluded that he did so. Claxton therefore is not entitled to a discharge of his personal federal income tax liabilities for the years 1985 through and including 1996 because the United States has established its defense under 11 U.S.C.

§ 523(a)(1)(C). As stipulated, he is also not entitled to dischargeability for the year 1997.

For the foregoing reasons, Claxton's tax liabilities during the years in suit are not dischargeable. A separate judgment order will be issued this date in conformity with this decision.